Case number 14-1153. Western Minnesota Municipal Power Agency et al. Petitioners v. Federal Energy Regulatory Commission. Ms. Kalin for the petitioners, Ms. Cather for the respondent. Petitioners v. Federal Energy Regulatory Commission. Mr. Kalin? Good morning, Your Honors. My name is Sam Kalin and I represent the petitioners in this case, the Western Minnesota Municipal Power Agency, along with the American Public Power Association and the Public Power Council. This case is about the Commission's decision to subdivide municipal preference and create a superclass of municipalities under Section 7 of the Federal Power Act when affording municipal preference. It's not about the wisdom of whether or not all municipalities should get preference or should not. After all, as the Supreme Court noted in the Utility Air Resources Group case in 2014, and I quote, an agency has no power to tailor legislation to bureaucratic policy goals by rewriting unambiguous statutory terms, end quote. This case, therefore, is about whether or not the language of Section 7 of the Federal Power Act is ambiguous, and assuming that this Court does find that it's ambiguous, whether or not the Federal Energy Regulatory Commission provided a rational explanation for the choice that it made and whether or not its interpretation of the statute was a reasonable construction of the statute. On the first point, Section 7A of the Federal Power Act requires or provides that the Commission shall give preference to applications by, quote, states and municipalities provided that their plans are equally well adapted when issuing a preliminary permit. This is not a case, like Chevron, where you have a statutory term that is ambiguous. In Chevron, as we know, it was a question of what does the term source mean. Here, the statute specifically provides that there is a definition of the term municipality in Section 3.7 of the Federal Power Act. Congress defined municipalities as political subdivisions, and I quote, of a state competent under the laws thereof to carry on the business of developing, transmitting, utilizing, or distributing power. And it's important there to note that Congress chose the phrase a state. It didn't say the state in which the resources are located, and it did not say the state nearby. It did not say the state nearby resources. It said a state. So neither the language of Section 7A of the Federal Power Act or the definition in Section 3.7 of the Federal Power Act has any geographic limitations on it. So how does the Commission get to conclude that the language is ambiguous? It seemingly provides two justifications. First, it suggests that perhaps the absurdity doctrine might apply. But, of course, the absurdity doctrine really is not a justification here. To begin with, the Commission, in its original order, didn't say anything about the absurdity doctrine. The entire analysis is contained in paragraphs 17 and 18 of the original order. And at that time, the Commission's justification was simply that they did not believe that granting the municipal preference to all municipalities would be appropriate. So then they invoke, in their re-hearing order at paragraph 20, the absurdity doctrine. But they really, again, really don't mean absurdity, because along in the same breath of saying absurdity, they use terms like mischievous, undesirable, or not likely intended. And there's no proper application of the absurdity doctrine in a case like this anyway. As this Court knows, the absurdity doctrine is when the language is completely unambiguous. When the language is clear and the drafters could not have intended, that there was no conceivable way that the drafters could have intended the result. So, for example, yes, Your Honor. Yes, Chief Judge. Can I? I'd like to distract you from your argument just for a moment. Go ahead. Imagine you won. Okay? It's your hypothetical. It's probably a good hypothetical for you. And then the example that Firk gives, there's a Hawaii public utility and there is a, I don't know, Boston public utility. Now, under those circumstances, would the agency be able to take that into account with respect to the equally well-adapted analysis? Without a doubt, Your Honor. They could? Yes. The regulations, the statute says that under Section 7A, the preference is a tiebreaker. It only comes into play if, in fact, the commission has determined that the applications are equally well-adapted. If the commission really did believe that the result would be absurd here, it has the tools available to it. It could decide that the Vermont municipality that wants to develop in Hawaii, and I'm not sure that would happen, but even assuming that it could or would happen, if that were to happen and the commission thought that was a deleterious result, well, the commission has available to it the ability to say, you know what, we think for the following factors or reasons that we think that the local developer in Hawaii would have a better adapted plan to develop the resources in Hawaii. So it clearly has available to it already the tools to avoid any kind of deleterious or absurd result that might apply. And going back to the absurd result, as I was noting, that it really only applies when the language is unambiguous. And the classic case is when the drafters prohibit, this is the old ancient case, when the drafters prohibit the drawing of blood in the streets and a doctor has to draw blood in order to save a patient and a court's able to effectively rewrite the statute by saying that there is no conceivable way in which the drafters could have intended that result. The doctrine is fully explained by Professor John Manning in the law review article that we cited. We got the absurdity doctrine.  And so the last justification that the commission, well, the reason I focused on it, Your Honor, is that it really took us off guard to even raise that. And so the last justification that the commission gives us is it says, you know what, there's another provision of the statute. It's a notice provision. The last part of Section 4-F, the proviso in Section 4-F, is a notice provision. And what that suggests, they say, is that somehow that implicates Section 7-A. But it's kind of curious how the commission does this. Because on the one hand, the commission says that, and this is at paragraph 21 of the rehearing order, that we have to read Section 4-F together with Section 7-A. And in the commission's brief at page 21, it talks about Section 4-F as providing qualifying language, somehow suggesting that that's qualifying language to Section 7-A. But, of course, that's not true because the commission goes out of its way on page 30 of its rehearing order, as well as footnote 47, to say that our interpretation of Section 7-A is not related to Section 4-F. We are bound by the language in 4-F. So it's really not reading the two together. And, in fact, it's not really suggesting that 4-F qualifies Section 7-A because otherwise the commission wouldn't be able to do what it's doing here, which is essentially saying that we have carte blanche flexibility now, once we've found ambiguity, to then interpret it Section 7-A however we wish. I thought that the commission precedent suggested that they have said that proximity could not be considered under the equally well-adapted prong and statute. The commission has it available. I thought there was precedent that said they will not do that. There is practice that the commission has that they typically do not do that. That does not mean that they cannot do it. I understand your argument that they surely – your argument is that they surely can if they're in the Hawaii and Washington case. You're saying they surely could do it. I'm just asking you, do they have precedent which says they don't read the statute? They do have cases that suggest, Your Honor, you're correct. They do have cases that suggest that they do not do that. But I'd call your attention then to Section 4.37 of their regulations. And the reason I say that is that the regulations even talk about if a non-municipal applicant comes in and a municipal applicant comes in at the same time, and now we have electronic systems, so they're usually tied. So if that happens, the municipal applicant under 4.37, and I think it's B3, talks about the ability of a municipality to come back in and make their application better adapted or equally well-adapted. So the commission's own regulation sort of suggests that they have to be able to do that. And that would mean that they'd have to read it. So I think it's a little disingenuous for the commission to really raise this specter of the fact that we have the potential of someone trying to develop in Hawaii with a municipality from Vermont because they can't look at the well-adapted, because clearly their regs contemplate that. That's what Congress contemplated. Well, let me just be clear. This 4.37F, it talks about if one of the two applicants is a municipality or a state and the other is not. Yes. So that doesn't quite meet the hypothetical of Boston and Hawaii. It does in the sense, Your Honor, if, in fact, you have a local non-municipal applicant in Hawaii and you have, let's say, a city of Burlington from Vermont going and trying to develop in Hawaii, then the commission has available to it under Section 7A and its regulations the ability to make a judgment about whether or not it thinks that the local developer in Hawaii has a better adapted plan. So that would fit this case in the sense that there is a private entity and a municipal entity. Yes, Your Honor. And if there are two municipal entities under the statute, couldn't they decide not to give preference to the further away one over the closer one on the grounds that they're not equally well adapted? Yes, Your Honor. They have that authority. Congress gave them that authority. It is only when the municipal preference is only a tiebreaker. It kicks in only once the commission has determined that the two projects are equally well adapted. So the commission, if it wanted to, and it wanted to avoid what it's now claiming are deleterious results, it has the ability to effectively avoid that. Are there further questions from the bench? You may want to preserve your time. You don't have to, but you may want to be able to respond to what the other side says. That's fine. I did reserve some time, Your Honor. This is part of the time. I would just make one final point. We also believe that even if, in fact, the court does find that the language is ambiguous, that we do believe, though, that there is no justification. The commission really hasn't given a rational explanation for its decision. So thanks. Ms. Kafer. Good morning, Your Honors. Holly Kafer for the commission. Perhaps we should start where we left off, which is the municipal versus municipal hypothetical. That's really precisely the situation that's driving the commission's concern here. With the development of long-distance transmission lines, with the development of regional markets. Why can't that be resolved by the equally well-adapted language? First, the commission has already said, it's quite clear in the precedent, as Judge Edwards indicated, that proximity is not a factor. I know, but I don't see why. That's the question. Maybe those decisions are wrong. And particularly if we were to hold as your opponent wants now, you would want to reconsider those questions. So what about the language that says you can't? It says, in issuing permits, the commission shall give preference to applicants by states and municipalities, provided the plans are equally well-adapted to conserve and utilize in the public interest the water resources of the region. So that sounds like, at the minimum, that sounds sufficiently ambiguous to permit a regulation that would prefer, or even an individual to education, that a municipality in the region would beat a municipality outside the region. And the commission has answered that question in the case cited in the petitioner's reply brief on page 11, NEW Hydro, which led to the second Oconto Falls case here, where the commission said that many licensees are headquartered a distance away from their projects to no ill effect, and so it did not choose to make proximity a basis. No effect isn't the question, though. It's equally well-adapted, not no ill effect. And it's in the public interest. The commission saw that there was, in that case, that there's no, and generally speaking, it's applied the precedent going forward, that proximity is not a basis to distinguish whether a project would be best suited to the development of the water resources. If we rule against you, are you committing yourself to never changing that regulation? Of course the commission has the discretion to be able to change its mind as long as it acknowledges the change and supports the change, of course. But I don't think that it's necessary to even get there, because the commission has chosen to deal with this problem by looking to the preference, which it can do under the terms of the statute when read in the proper context. To begin with 800A, there's nothing in that which permits the reading that you ask, is there? There's nothing in that that addresses this question at all. What the commission said is it just doesn't provide any guidance on what to do in circumstances where there's a distant municipality. Well, I wonder about that. Your position is it has to be in the vicinity, correct? Yes. The statute says you're to look at public interest in the water resources of the region. That sounds like you're wrong at least with respect to the scope of the vicinity. Why is that wrong? The commission used the phrase vicinity. It also used the phrase nearby. Yes, but are you saying they're not within the region here? Nearby doesn't sound like within the region. Well, the commission didn't address the use of the term region. I think that vicinity and nearby suggest something more narrow than region, but the commission hasn't addressed that. The statute provided, of course, will address this on a case-by-case going forward, just as it has addressed the equally well-adapted standard, just in reasonable rates. There are all sorts of standards that the commission essentially adds to as it proceeds. If you think there's nothing in 800 that resolves the question, where is the thing that does resolve the question statutorily? You said 800 doesn't resolve the question, but there's something else. When you read 7A in context with 4F, which provides for notice to any state or municipality likely to be interested in or affected by such an application, the commission believes that that raises a question about whether some limitation should also apply to 7A, and that's based on the purpose of 4F. The purpose of 4F, as this court has held, is to identify those municipalities that are entitled to the preference under 7A. 4F is the provision of the statute that authorizes the commission to issue the permits in the first place. Hold on one second here. You've made a lot of leaps. The first question is... You did it with a strange face, too. So we didn't say that. We didn't say that it identifies the only ones that are entitled. You're talking about the Colorado case. Right. Well, that's not what we said. 4F, what Colorado says is that the purpose of 4F is to allow municipalities who are notified to assert and protect their municipal preference. Yes, but it doesn't say it defines the only municipalities that have the preference. It just says it's to allow that. That's all it says. Right. But the commission doesn't dispute that. As the commission said itself, that the scope of municipalities eligible for the preference under 4F is likely narrower than... That, again, assumes that 4F has anything to do with entitlement to the preference. But just let me ask you about the language. Is something within the vicinity affected? Is that where it comes under the affected by? Yes. The commission has, in its regulations implementing 4F, used a proximity standard to determine whether a municipality deserves notice, that is, whether it's likely to be interested in or affected by. No, I'm asking about the affected part. I understand the argument that they are affected, but that leaves a separate or, those that are interested in. Right. So what if this agency sent you a letter and said, we are interested, not just likely, we are interested in. It doesn't strike me there's anything in F that precludes them then. They've satisfied, even on your view of F, which is it's an entitlement rather than a notice provision, you are now on notice that they are interested. Why are they excluded if they're interested? The commission has consistently used proximity to determine... I don't care. For the purpose of this back and forth, I don't care what the commission said, because that's what we're trying to decide, whether the commission's view is the appropriate one. So now I want to know, why is it that if somebody tells you they're interested, under the language of F, strictly on the plain language, why don't they come with an F? If the petitioners in this case send FERC a letter and they say, we are desperately, not just likely, desperately interested in this, don't they come with an F? They come with an F for the purpose of notice. Okay. So now you have neither the principal statutory section nor F to support FERC's position. So now what's FERC's position? I think that we do still have F. We are conceding that the scope of municipalities under 4F is not necessarily the same as the scope of municipalities under 7A. I thought you were saying that F defines which municipalities are the ones that are entitled to the province. That's not your position? We're saying that's a piece of the puzzle. We're saying proximity defines which municipalities. But the words proximity are not in the statute. So I'm asking you which statutory provisions you are relying on. There aren't that many here. This is a pretty limited case, unlike some of the other cases we face. And I'm just asking you which section you are relying on. The idea of proximity definitely comes from 4F. And we do think that what the court has said about that, about the connection. Assume we don't agree with you on what the court said. Assume you can't rely on the Colorado case, because obviously we're going to read it and we don't defer to your reading of it. So now you're left with only the statute. The statute says the first part of the statute has no proximity limitation, the one we talked about before, right? Right. The preference section just doesn't say anything about it. Okay, so now you then told me to take a look at F. I looked at F, and I'm telling you that the petitioner in this case advises you that they are interested. So they now appear to come within F. So where do we go next? Where we go next is to, with an ambiguous statute, the commission's understanding and its role in balancing the competing interests at stake here between public and private. Congress intended for the statute to provide a balance between public development and private development. Yeah, well, I mean, the problem you have is that 800 is so clear. It's a slam dunk. It says, shall be given preference provided their plans are equally well adapted. You've said their plans are equally well adapted. And the F, I don't know how you get the F, because if anything, all F is suggesting is the commission is wrong in another way. The proximity can be relevant with respect to an equally well adapted inquiry. That's the force of 4F, as far as I can see. That is, you could read 4F to simply say proximity is relevant to who gets notice. And these folks, certain folks may not get notice if they're out of what you think is reasonable proximity. It doesn't foreclose on the compiling number 800, but it may be relevant to an inquiry as to who's equally well adapted. So the commission seems wrong on all counts. But, I mean, the language is so straightforward. Shall give preference provided their plans are equally well adapted. You can't rewrite the policy. That's congressional. This court has said, Sierra Club versus EPA, 551, the third, 1019, 2008, that even if the statute is superficially clear, we still go to the traditional tools of statutory construction. It's not superficially clear. It's more than superficial. How could Congress be clearer? I thought you told us in your own brief that the congressional legislative history is mixed and in a way nondispositive. Isn't that what you said? It's mixed. We think that on balance. It favors us, just as in Oconto Falls, really. Is that enough to get over the first, when you say under the first step of Chevron, we look at the legislative history. It's not enough just to say, if you have a statute that on its face appears one way, and now you're driven to that is superficially. And then you're driven to the legislative history. And the best you can say about the legislative history is that it's unclear, goes both ways. That doesn't really get you to the first step of Chevron, does it? It doesn't get you past it. The commission thinks that it does with 4F. Again, 4F is intended to, I'm sorry to say it, but as this court has said, 4F is intended to identify those municipalities that want to assert and protect their right to the municipal preference. We are guided by that language, particularly coming from this circuit. It was not an unreasonable choice to make. And, yes, I don't think that the legislative history has to be a slam dunk for the commission in order for the language to be considered ambiguous, particularly when you consider that the court has found the preference, the application of the preference for orphan projects to be, for the language there to be ambiguous. Same thing in Clark Cowlitz Joint Operating Agency. The commission obviously has struggled with the preference, and nothing demonstrates that more than Clark Cowlitz, where the commission was affirmed on one interpretation that it did apply and then on the interpretation that it didn't apply in different circuits. It's a difficult question. Congress did not anticipate the extent of development of long-distance transmission and regional markets, as the commission points to in its orders, when it was crafting this language in 1920. And this court knows that perhaps better than any other court from cases like its review of Order 888 in Transmission Access Policy Study Group that led to New York v. FERC, where the courts have acknowledged, the Supreme Court has acknowledged, that the statute and the congressional intent simply don't match with where we are today. Where we are today is where a main municipality can become a super-competitor, talk about becoming super-competitors, can become a super-competitor to deprive a municipal utility in a place like Hawaii or in a place like Alaska that is disconnected from the rest of the system. Again, this argument only works if you're right about the well-adapted provision. And if you're wrong about the well-adapted position, they don't become a super-competitor over a Hawaii public utility. I don't think the question is whether I'm right or wrong. It's that the commission is bound to follow its own precedent. Now, if the court tells us that that's incorrect, that's different, obviously. Well, if the court tells you, if the premise of your previous decision is a premise based on vicinity as the way to resolve the question of preference, and we tell you that that premise is wrong, that certainly gives you an opportunity to reconsider the decision about what well-adapted means, right? That seems like an obvious rationale for reconsidering. Right. Yeah. The commission is trying to avoid a problem here with the municipal versus municipal competition. I think that your honors can see that the ability of a distant municipality to essentially take a project from a local municipality is not something that the commission thinks is in the public interest. We think that we made a reasonable choice to get there to solve that problem through the municipal preference. But the consequence is, it's like overdoing it in a certain way, right? So, yes, it's one way to prevent, I'm going to use my hypotheticals, I don't know why I'm picking Boston, but it's in my mind. It's one way to prevent a Boston utility from beating a Hawaii utility. But it has the consequence of also knocking out a Hawaii utility on another island of Hawaii. And in this case, it has the consequence of knocking out a utility that already serves Iowa. So, maybe there's a better way to do that. And another way which it could be done without the consequence is to use the well-adapted language, rather than to say, even a close but not in the vicinity utility doesn't get the preference, which is where you are now. The standard the commission has adopted, I don't see where we necessarily get to another island of Hawaii being precluded from competing for that project. Well, you do get to a situation here where a company that already serves Iowa, correct?  That's what they said. Yeah, that's what's represented in the briefs. Doesn't get a preference for a dam in Iowa, correct? Right. They are about 400 miles away. The commission has only ever addressed from the cases that the petitioner has identified, from the cases that the commission has identified. Municipalities are essentially pushing the limits here. There is only one other case, that's City of Tacoma, cited in the briefs, where a municipality was further away than western Minnesota is now. And in that case, there were two municipalities joined together as a team. I don't think that the preference was actually even applied in the end. However, if you're looking at pure mileage, the second municipality made it 150. So I don't think that there should be an idea that western Minnesota is doing something here that's commonplace. If even they have been unable to identify a municipality that received a preference for something further away or even, quite frankly, close to it. That's just not what we have here. What we have here is because of the development of long-distance transmission, because of the evolution of the markets, the commission has to look at the statutory language in that context. I'd say that the court does, too. Context is controlling. We all know that. And it needs to address this problem as far as the choice of whether it could have better done that. The language about context is controlling. It refers to the statutory context. It doesn't refer to developments in industries. Right? The language you're talking about is from a Supreme Court case about Justice Scalia's opinion about looking at the entire statute in the context. It doesn't say, let's look at how the industry has developed. But we do look at whether the statute can function in a way that makes sense in light of what Congress knew at the time. I think this is actually quite not dissimilar to the King v. Burwell circumstance that came up just last term. And there the court also relied on looking at does the statute function the way that Congress intended it to? And here we think that Congress, frankly, could not have anticipated in 1920 the development of independent system operators, regional transmission organizations, the extent of long-distance transmission development. This court has said it itself that Congress did not see this coming. No one really did. Even if they thought that there would be, you know, a 400-mile line or something like that, that's not where we are today. And the commission is forced to look at that factual context when it understands the statutory terms. Other questions? Thank you. Senator Clady, reserve some time. Yes, because there's a lot there. And I guess I would like to begin, though, by noting, first, that the Section 4F, which is a notice provision, was passed, obviously, in 1920. It made a lot of sense to put a notice provision in there. The Federal Register Act was passed in 1935. Code of Federal Regulations came in in 1937. So Congress, in the FPA, when it originally adopted, it made sense to at least put a notice provision in there, but it had nothing to do with Section 7. Secondly, the second point is that, as this Court was talking about, and Chief Judge, as you were noting, in terms of region versus nearby or vicinity, the commission uses a whole bunch of different terms throughout. And, in fact, it's deliberately telling us we don't know what that test in the vicinity means. It's saying it's going to be flexible and it's going to evolve over time, and we have no real guidance. But they even said, again, distant, used the word distant. All of Western Minnesota Municipal Power Agency's power is going to MRES. MRES has 17 members in Iowa. So there are members in Iowa that get a prorated share of this power. So the commission, when it's talking about distant, isn't even looking at this particular project. It looked at the fact that it was 400 miles. The problem with that kind of analysis is the commission's own order, their own order, says at paragraph 26, they suggest at paragraph 26 that, of course, any municipality in a state where the project's located will get preference. The difficulty with that is you've got Buffalo that's 470 miles from New York City. I think El Paso is roughly about 700 miles from Houston. Who knows the distance, but it's well over 400 between northern part of California and southern part of California. So they're not even consistent with their own opinion about using the idea of distance. And they clearly aren't saying in any place that we're going to only limit it to one state, regardless of distance, because you have areas like here in the Mid-Atlantic region where Maryland, Virginia, and Pennsylvania are fairly close by, and they're not going to limit the municipal preference there. The last point, Your Honor, is that when the commission talks about the fact that they're worried about that. At that first point, it seems like their argument is not so much distance as the people who live in the state in which the dam is, either via a municipality, which is chartered by the state, or by a city, which is itself chartered by a state, or by the state itself. It seems more like a desire on the part of the commission to limit the preference to the state that has the natural resource, not just to the something that's close by. That could be, Your Honor, but we really don't know because they haven't told us much about what the infacinity means. And they've also neglected to point out that all the power here goes to MRES, and MRES will ultimately distribute that power to 17 of its members in Iowa. And my time is up, but there's one last point I would like to make. The commission talks a lot about the fact that in 1920, Congress didn't envision the grid devolving. Well, there's two problems with that. They say that statute of intents has no awareness of that. Section 20 of the Federal Power Act has a provision in there that allows the commission to regulate interstate rates. And clearly, in the 1920s, the evolution of the interstate grid was growing. One can take a look at Felix Frankfurter and Mr. Landis' famous 1925 Yale Law Journal article about compacts, and there are three or four pages in that law review article that talks about the notion of what they called a superpower. It was going to be a grid going from all the way from Boston in the New England area down to the Mid-Atlantic region. How many members of Congress read the Yale Law Journal? Well, they probably read Mr. Landis as well as Mr. Frankfurter or soon to be Justice Frankfurter, but they probably also listened to Mr. Hoover, who was giving speeches about the superpower concept. The point, though, is that it was so well known at the time that the grid was evolving that it even made its way in one of the most famous law review articles in our time. So unless there are any other questions? There aren't. We'll take them out under submission. Thank you very much. We'll also take a brief break while the new lawyers move up.
judges: Garland, Rogers, Edwards